UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA KOVACS,

               Plaintiff,                    CASE NO. 17-13577
                                              HON. DENISE PAGE HOOD

v.

ASSOCIATES IN NEUROLOGY,
P.C., and DR. MARK A. KACHADURIAN,

               Defendants.

_____/

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#19]

## I.    INTRODUCTION

On November 1, 2017, Plaintiff Melissa Kovacs filed the instant action alleging that Defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.* ("ADA"), and the Michigan Persons with Disabilities Civil Rights Act, M.C.L. § 37.1201 *et seq.* ("PWDCRA"), when they failed to accommodate her disability, terminated her in retaliation for requesting an accommodation, and discriminated against her on the basis of her disability.  On August 30, 2018, Defendants filed a Motion for Summary Judgment. [Dkt. No. 19] The Motion has been fully briefed, and the Court held a hearing on the Motion.  For the reasons that follow, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.

1

## II.     STATEMENT OF FACTS

Plaintiff began her employment with Defendant Associates in Neurology, P.C. ("AIN") in September 2008.  AIN specializes in the diagnosis and treatment of stroke, seizures, epilepsy, neuropathy, headaches and other neurological disorders. AIN has offices in Farmington Hills, Southfield, and Novi, and it performs Magnetic Resource Imaging ("MRI"), Electroencephalogram ("EEG"), and Evoked Potential ("EP") tests to diagnose neurological conditions.     Defendant Mark A. Kachadurian ("Kachadurian") is a physician at AIN.  Denean Evans ("Evans") was hired as AIN's Practice Manager in January 2016, and she provides a range of administrative services for AIN while working in its Farmington Hills office.

Plaintiff worked as an EEG technician primarily in AIN's Novi, Michigan office, and she worked a schedule of 7:30-4:30 on Monday, Wednesday, and Friday and 7:30-3:00 on Tuesday and Thursday, as she requested.  A typical EEG test lasts 20 minutes, although time is also needed for set up, so in AIN's Novi office, 90 minutes are allotted on the schedule for each EEG test.  AIN's schedule generally allows for 5 EEG tests in a day, and Plaintiff rarely conducted more than 4 EEG tests in a day.  The appointment schedule for EEG tests at AIN's Novi office is available to staff on one or more office computers.  Plaintiff's work quality was good, and she was not the subject of any patient complaints or discipline during her employment.

2

In the fall of 2015, a consultant suggested to AIN that AIN outsource its EEG testing to Synapse Neurodiagnostics ("Synapse").   In October 2015, AIN's two managing partners (Drs. Elkiss and Silverman) met with Synapse's owner, Greg Lukasik ("Lukasic"), to discuss the possible benefits of outsourcing EEG testing. Drs. Elkiss and Silverman ultimately concluded that Synapse would "provide better services for our patients" than AIN had been able to provide in the past and decided to outsource all EEG testing to Synapse.  On November 12, 2015, AIN and Synapse agreed to a Diagnostic Imaging Lease Agreement ("Agreement"), pursuant to which Synapse would use its own EEG technicians to perform backlog and regular testing for AIN.   The Agreement provided that services would be provided at AIN's Farmington Hills location "and possible various locations, depending where EEG testing is to be performed."  [Dkt. No. 19-10 at Ex. A]

After the December 2015 retirement of the Southfield EEG technician and the January 2016 resignation of the Farmington Hills EEG technician, Synapse took over EEG testing at those two offices.  By August 2016, Synapse was handling all of AIN's EEG testing except in the Novi office, where Plaintiff was available to provide coverage (unlike the Southfield and Farmington Hills offices, where there were no technicians in place).

In 2011, Plaintiff was diagnosed with Meniere's disease, a chronic disorder of

the inner ear.[1]  Prior to 2016, Plaintiff only had minor episodes of Meniere's disease, during which she experienced fuzzy vision, "very minor" hearing loss, and ringing in her ears, but no dizziness or vertigo. These minor episodes lasted 5 to 15 minutes.

In 2016, Plaintiff had three major episodes and some minor episodes at work. During a major episode, Plaintiff experiences vertigo, hearing loss, tinnitus, pressure in the ears and vision problems.  Chronic stress triggers the symptoms of the disease. Plaintiff's co-workers, as well as Kachadurian, witnessed Plaintiff having major episodes, including falling down.  On at least one occasion, a co-worker, Glenora Hawley ("Hawley"), the most senior person at the Novi location (who Kachadurian called a "team leader"), helped Plaintiff into a patient room to lay down and clocked Plaintiff out so Plaintiff could leave work for the day.  When Plaintiff experienced minor episodes at work, she would continue working for the day. Plaintiff occasionally called into work following minor episodes, in which case she would either be late or sometimes cancel her schedule for the day. Plaintiff' co-workers, including the doctors and staff, knew she had Meniere's disease.  Kachadurian treated Plaintiff as a patient, though he treated her epilepsy and did not diagnose or treat

---

[1]Plaintiff also has been diagnosed with complex partial epilepsy, which causes her to have seizures, but Plaintiff has not alleged that her epilepsy is a basis for this cause of action.

Plaintiff's Meniere's disease.

Following her first major episode at work and ear surgery in February 2016, Plaintiff met with Evans (as AIN's human resources manager) on March 15, 2016. The meeting was scheduled after Evans learned of two patient complaints about last-minute EEG test cancellations in Novi.  Evans met with Plaintiff to talk about the cancellations and to see if AIN could do anything to assist her. Hawley sat in on the meeting. Evans wanted to see how Plaintiff was doing, and Plaintiff said that she was doing "okay." [Dkt. No. 19, Ex. A at 126-27]  Plaintiff told Evans that another co-worker, Ilene Abrin ("Abrin"), was "f'ing up [Plaintiff's] schedule" and asked Evans to talk to Abrin. *Id.* at 126, 196-97.  Evans agreed to do that. *Id.* at 197.  Evans stated that Plaintiff did not tell Evans precisely what Abrin was doing to her schedule (Abrin was scheduling five or six patients for Plaintiff without notice or consent) or that Plaintiff needed to be limited to four patients because she assumed that Evans knew of her inability to handle more than four patients. *Id.* at 196-97.  Plaintiff never provided AIN with medical documentation stating that Plaintiff needed a light schedule or to be limited to no more than four EEG patients in a day. *Id.* at 135.

Plaintiff claims that she told Evans that Abrin was scheduling Plaintiff too many patients, causing Plaintiff a lot of stress.  Plaintiff states that she requested accommodation in the form of a light schedule, a fixed schedule of four patients per

day, or advance notice (she did not explain to Evans what that meant) if the schedule were to include five or six patients per day.  Between March and August 2016, Plaintiff states that she had several conversations with Evans.  Evans denies that Plaintiff ever made Evans aware of being overscheduled, stating that discussions of that nature "never happened."  Evans testified that, other than being made aware of Plaintiff's "possible medical condition," Evans "wasn't aware of any other issues."  Nothing changed with Plaintiff's schedule after the March meeting with Evans.

Evans acknowledged that Plaintiff disclosed during the March 15, 2016 meeting the possibility that Plaintiff might have Meniere's disease and then started to cry.  In this meeting, Plaintiff and Evans discussed scheduling issues arising out of absences attributed to Plaintiff's medical condition.  Hawley affirmed that Plaintiff's Meniere's disease and absences from work were discussed in that meeting and that Plaintiff was upset and crying.  Evans did not make any inquiry as to whether Plaintiff might need accommodations for her medical condition, as it never crossed Evans' mind to inquire about accommodations.

Although Plaintiff suffered several Meniere's episodes between March and August 2016, at work and at home, and she occasionally was too ill to see patients, Plaintiff was not disciplined for any of those absences. Hawley states that Kachadurian and other physicians were upset, complained, and were frustrated when

patients had to be rescheduled as a result of Plaintiff having an episode.  Plaintiff states that Hawley, who had a personal and professional relationship with Kachadurian, told Plaintiff that Kachadurian did not want her there.  Plaintiff states that Hawley: (1) texted Plaintiff, "I have to tell you something. There's a problem that you may be fired or that you're – that [Dr. K's] seeing you…as a liability;" and (2) communicated to Plaintiff that Kachadurian told Hawley that Plaintiff is "missing a lot of work…She's a liability." [Dkt. No. 25, Ex. 1 at 228-29] Another co-worker, Jaclyn Kleebik, told Plaintiff, "Dr. K thinks you're a liability, and he wants you gone." *Id*. at 229.  At her deposition, Hawley denied telling Plaintiff that Kachadurian called Plaintiff a "liability." *Id*.

As of August 2016, AIN had outsourced EEG technician work to Synapse only for its office locations in Farmington Hills and Southfield, and as far as Lukasik was concerned, that was the extent of Synapse's relationship with AIN. [Dkt. No. 25, Ex. 5 at 61-62]  At some point in August 2016, Evans, at the direction of the managing partners, approached Lukasik to see if Synapse wanted to take over the EEG testing in Novi. *Id.* at 63-64. On August 11, 2016, Evans met with Plaintiff to advise Plaintiff that Plaintiff's last day of work at AIN would be Friday, September 9, 2016, because all EEG testing was being outsourced to Synapse.  At some point after Plaintiff was notified that she was being terminated, Evans suggested to Plaintiff that Plaintiff apply

for social security disability due to her condition.

The first week of September 2016, Evans again approached Lukasik about taking over the EEG technician services in Novi. *Id.* at 64. Taking over Novi was not a goal for Lukasik, and he testified that if "AIN didn't ask me [a] second time in September [2016], I wouldn't have asked about it myself." *Id.* Evans communicated that AIN intended to terminate Plaintiff's direct employment with AIN. Lukasik asked Evans "if [Plaintiff] is leaving." *Id.* Evans told Lukasik that Plaintiff "is not going to continue." *Id.* This conversation caused Lukasik to assume Plaintiff would be fired by AIN. *Id.* Because Plaintiff had prior experience at Novi, Lukasik asked Evans if he could hire her as an independent contractor. *Id.* Evans told Lukasik he could hire Plaintiff, but there was no further discussion about any terms or conditions for Plaintiff's status with AIN or Synapse. *Id.* at 64-65.

Lukasik approached Plaintiff about working as an independent contractor for Synapse at a higher hourly rate than what she earned at AIN, but, advised her that as Synapse technicians are independent contractors, they receive no benefits. Lukasik offered Plaintiff the opportunity to work at AIN's Novi location three days per week performing EEG tests and additional work at home doing digital scanning. *Id.* at 87-88. Lukasik told Plaintiff she would lose her benefits and that Synapse did not provide benefits. *Id.* at 92. Plaintiff initially accepted the position and was scheduled

8

to start working as an independent contractor without benefits for Synapse on Monday, September 12, 2016.  On September 11, 2016, Plaintiff advised Lukasik that she would not be coming to work for Syanpse.

Plaintiff claims that, on September 9, 2016, Lukasik called her and "said that the [AIN] doctors didn't want me there [at the Novi facility] because I was a liability." Dkt. No. 25, Ex. 1 at 176. Plaintiff states that Lukasik said he "spoke with the doctors in the meeting….they said they don't want you there. And I wanted to take you on, but they didn't want you there." *Id*. at 208. Lukasik told Plaintiff that he "tried to get her more [days on the schedule], but the doctors don't want you here. You're a liability." *Id*. at 208. Plaintiff withdrew from working for Synapse because she was not comfortable with the arrangement and understood she was not wanted by AIN, *id*. at 176-78 (AIN "intentionally did the Synapse and all that just to get rid of [me] because of [my] disability"), and she "took that as…a termination at AIN, that Dr. K didn't want me there…" *Id*. at 199.

Synapse hired Kathy Harden to handle the EEG testing at the Novi office that Plaintiff would have conducted.  Plaintiff asked Hawley why AIN had selected Harden to work as a technician instead of her. Hawley responded, "'Cuz you were missing work…that's what he [Kachadurian] was mad about. Missing work all the time and texting him while he's at his kid's graduation type stuff." Dkt. No. 25 at Ex.

6. Kachadurian denied making those statements, although he admitted being concerned about a backlog of patients. *Id*. at Ex. 2 at 22-24. Kachadurian admitted complaining about Plaintiff – or her husband – texting him during his kids' events about Plaintiff's medical problems (because Kachadurian was her treating doctor). *Id*. at 25-26.

After her termination, Plaintiff asked Hawley to provide a statement concerning her charge of discrimination, but Hawley expressed her concern about retaliation by AIN if she provided a statement in support of Plaintiff. *Id.* at Ex. 4 at 37-38 and Ex. 6. Hawley also texted Plaintiff about statements allegedly made by Kachadurian to the effect of, "she's a good tech, but can't keep missing work." *Id*. at Ex. 6.  Hawley shared her understanding that Plaintiff's medical condition motivated AIN's decisions, texting Plaintiff, "Cuz even in the meeting with Dennie [Evans] she was asking you about your condition and how much work you missed from it and whether you'd be missing any more work from it so right there is proof it's cuz your condition." *Id*. Finally, with regard to providing a statement for Plaintiff's discrimination charge, Hawley wrote, "Girl trust me. I feel horrible for you. And yesterday he was telling a [patient] they can't fire you for medical issues! I was FUMING inside." *Id*. at Ex. 4 at 39.

On November 1, 2016, Plaintiff filed a charge with the Michigan Department

of Civil Rights ("MDCR"), claiming that she had been fired by AIN "with no reason given" but that she believed she was discharged due to her disability. On January 24, 2017, Plaintiff submitted an amended charge, claiming that she had requested that her "schedule to remain the same with no unexpected patients added" but that AIN had denied the request. After investigation, including multiple witness interviews, the MDCR dismissed the charge on July 17, 2017, as without cause. The EEOC issued its dismissal and right to sue notice on August 3, 2017.

Plaintiff's five-count Complaint includes the following claims: (1) AIN violated the ADA by failing to accommodate her disability (Meniere's) (Count I); (2) AIN violated the ADA by terminating her employment in retaliation for requesting a reasonable accommodation (Count II); (3) AIN violated the ADA by terminating her employment because of her disability (Count III); and (4) Kachadurian violated the PWDCRA by discriminating against her when he terminated her employment because of her disability (Count IV); and (5) Kachadurian violated the PWDCRA by terminating her employment in retaliation for requesting a reasonable accommodation (Count V).

## III.   LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.   APPLICABLE LAW FOR ADA/PWDCRA CLAIMS

To establish a prima facie case under the PWDCRA/ADA,[2] a plaintiff must show that (1) she is disabled; (2) she was qualified for the position without or without accommodation; (3) she suffered an adverse action; (4) that the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open, the individual was replaced by a similarly-situated, non-disabled employee, or similarly-situated, non-disabled persons were treated more favorably than she was. *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2001); *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

> The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA defines "discriminate" to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business. *Id*. § 12112(b)(5). To establish a prima facie case, a plaintiff must show that he is disabled and otherwise qualified for the position, either with or without reasonable accommodation. *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir.2001). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that accommodating the plaintiff would impose an undue hardship on the operation of its business. *Id*.

---

[2]The PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the Plaintiff's PWDCRA claim." *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002) (citing *Monette v. Electronic Data Systems Corp*., 90 F.3d 1173, 1178 (6th Cir. 1996)).

13

*Keith v. Oakland County*, 703 F.3d 918, 923 (6th Cir. 2013).

In order to set forth a *prima facie* claim for failure to accommodate under the Act, Plaintiff must demonstrate: (i) she is disabled under the ADA; (ii) she was otherwise qualified for the position, with or without reasonable accommodation; (iii) AIN knew or had reason to know about her disability; (iv) she requested an accommodation; and (v) AIN failed to provide the necessary accommodation. *Johnson v. Cleveland City School Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011); *Judge v. Landscape Forms, Inc.*, 592 Fed.Appx. 403, 407 (6th Cir. 2014) (internal citation omitted); *Spiteri v. AT & T Holdings, Inc.*, 40 F.Supp.3d 869 (E.D. Mich. 2014).  As part of this prima facie case, Plaintiff "bears the initial burden of proposing an accommodation and showing that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007) (citation and internal quotations omitted); *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010).  Plaintiff also carries the burden of proving that she will be "capable of performing the essential functions of the job with the proposed accommodation." *Id*.

> In cases in which the plaintiff is seeking some accommodation on the part of the employer, and is claiming that he or she would be qualified to perform the essential functions of the job with such reasonable accommodation, the disputed issues will be whether such accommodation is reasonable, whether such accommodation would impose an undue hardship upon the employer, and/or whether the

14

plaintiff is capable of performing the job even with the suggested accommodation, each of which may also be resolved through direct, objective evidence.

*Monette*, 90 F.3d at 1183.

The ADA also prohibits employers [. . . ] from "discriminat[ing] against any individual because such individual has ... made a charge ... under this chapter." 42 U.S.C. § 12203(a). "Discrimination here means retaliation—that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.'" *Ford Motor Co.*, 782 F.3d at 767 (citations omitted). ADA retaliation claims are analyzed under the familiar McDonnell-Douglas burden-shifting framework. *Id.* (citation omitted).

*McDonald v. UAW-GM Ctr. for Human Res.*, 738 F. App'x 848, 855 (6th Cir. 2018).

## V.  ANALYSIS

Defendants do not dispute that, due to her Meniere's disease, Plaintiff is disabled within the meaning of the ADA, nor do Defendants dispute that Plaintiff was fully qualified for her job as an EEG technician with or without accommodation. There is no dispute that Plaintiff suffered an adverse action when AIN terminated her employment, effective as of September 9, 2016.  But, Defendant claims Plaintiff has not produced evidence sufficient to avoid summary judgment on her claims of retaliation, termination, and discrimination related to her disability.

## A.  Retaliation and Discrimination Claims (Counts II and III)

Plaintiff contends that there is direct evidence that Defendants retaliated against her when they terminated Plaintiff because of her disability.  Plaintiff relies on the fact

that Defendants hired a replacement with qualifications similar to Plaintiff's, which "demonstrat[ed] a continued need for the same services and skills." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir. 1979). Plaintiff argues that when Synapse employed Kathy Harden as an EEG tech to do the work Plaintiff did at AIN's Novi office, Defendants replaced Plaintiff. Plaintiff argues that, since Synapse intended to fill Plaintiff's position with AIN by contracting with Plaintiff, there is substantial direct and circumstantial evidence that AIN regarded Plaintiff as disabled.

The direct evidence Plaintiff relies upon is that:

(1) Kachadurian and other physicians voiced their anger and frustration about Kovacs and her medical condition; (2) Kachadurian stated he did not want Kovacs there; (3) Hawley told Kovacs, "I have to tell you something. There's a problem that you may be fired or that you're – that [Dr. K's] seeing you…as a liability;" (4) Regarding Kovacs, Kachadurian told Hawley, "She's missing a lot of work…She's a liability;" (5) Another co-worker, Jaclyn Kleebik, told Kovacs, "Dr. K thinks you're a liability, and he wants you gone;" (6) Lukasik called Kovacs and "said that the doctors didn't want me there because I was a liability;" (7) Lukasik explained to Kovacs that he "spoke with the doctors in the meeting….they said they don't want you there. And I wanted to take you on, but they didn't want you there;" (8) Lukasik told Kovacs that he "tried to get her more [days on the schedule], but the doctors don't want you here. You're a liability;" and (9) Rather than discussing possible accommodation, Evans suggested Kovacs apply for social security disability due to her condition.

Defendants argue that Plaintiff's reliance on Hawley's (or Kleebik's or Lukasik's) alleged comments regarding statements by AIN management or Kachadurian is misplaced. Defendants contend that Hawley, Kleebik, and Lukasik

16

were not decisionmakers or management level employees whose statements could be attributed to AIN.  But, Plaintiff claims Hawley made those statements or sent the texts regarding the statements of Kachadurian and other AIN physicians.  And, if Hawley, Kleebik, and/or Lukasik testify(ies) about statements by AIN management or Kachadurian, any such statement(s) will be admissible at trial as party admissions. The fact that Hawley and Lukasic have denied certain statements does not foreclose Plaintiff's claims; those denials will have to be evaluated by the jury at trial. Defendants are correct, however, that such persons cannot speculate about why AIN terminated Plaintiff.

Plaintiff argues that, even if the foregoing facts do not constitute direct evidence of discrimination, it should be considered "strong circumstantial evidence of discriminatory motive." Citing *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (holding that where statements did not constitute direct evidence of age bias, "[t]hey might…raise some suspicion as to [the employer's] motives…").  Plaintiff believes that, under either analysis, there is enough evidence for a reasonable jury to conclude that AIN was motivated by Kovacs's disability in terminating her direct employment.

Defendants argue that Plaintiff was not replaced by someone outside of her protected class or treated differently than similarly-situated non-protected employees.

Defendants assert that AIN treated all of its EEG technicians the same – the EEG technician positions were eliminated in Farmington Hills, Southfield, and Novi. Defendants state that AIN's outsourcing of its EEG work to Synapse has been recognized as a legitimate, non-discriminatory business decision. *Felder v. Nortel Networks*, 187 F. App'x 586, 592-93 (6th Cir. 2006). Defendant also represents that, to the extent that Plaintiff was "replaced," she was replaced by Harden, who had cancer and, like Plaintiff, was disabled.

The Court finds that Plaintiff's argument ignores the fact that Defendants did not "hire" any "replacement" because AIN eliminated Plaintiff's position and contracted for EEG technician work at the Novi office to be provided by Synapse. The Court notes that AIN took the same action at its other locations and had already contracted with Synapse to provide AIN with EEG technician services at the Farmington Hills and Southfield locations. Because AIN eliminated having an EEG technician on its staff and payroll, the Court concludes that Plaintiff was not replaced or terminated because of her disability. And, even if Plaintiff was replaced, she was replaced by someone in her protected class (Harden, who had cancer).

For these reasons, the Court holds that Plaintiff cannot satisfy the fifth requisite element of discrimination under the PWDCRA/ADA (that the position remained open, the individual was replaced by a similarly-situated, non-disabled employee, or

18

similarly-situated, non-disabled persons were treated more favorably than she was). *Whitfield*, 639 F.3d at 258-59; *Talley*, 61 F.3d at 1246. As Plaintiff cannot establish a prima facie case of discrimination under the PWDCRA and/or the ADA, the Court dismisses her claims for disability discrimination and retaliation with respect to her termination (Counts II and III).

## B. Failure to Accommodate Claim (Count I)

Defendants assert that Plaintiff never requested an accommodation. Defendants contend that Plaintiff told Evans in March 2016 only that Arbin was "f'ing up" Plaintiff's schedule but not: (1) how Plaintiff's schedule was being messed up; or (2) that Plaintiff needed to be accommodated in her workload, including by having a lighter or limited schedule because of her disability. Defendants also argue that Plaintiff never provided Evans (or anyone at AIN) with any medical documentation that required that Plaintiff have a different schedule or be accommodated in any way. Finally, Defendants contend that Plaintiff has offered conflicting testimony regarding whether she asked for advance notice if she was being scheduled to perform EEG tests for more than four patients. Citing *Sjostrand v. OSU*, 750 F.3d 596, 605 (6th Cir. 2014) ("We do not believe that the standard of review for summary judgment. . . requires us to ignore a party's own conflicting statements in construing the facts to her best advantage.").

Viewing the facts in a light most favorable to Plaintiff, the Court finds that there is a genuine dispute of material fact whether Plaintiff provided Evans with a request for accommodation because of her disability.  There is evidence that Plaintiff asked Evans to have only four patients a day or get advance notice if she was scheduled to have more than four patients.  There is evidence that Evans knew Plaintiff had Meniere's disease and that it impacted Plaintiff's ability to work.  And, it is undisputed that Plaintiff's schedule did not change at any time before she was terminated.  Accordingly, the motion for summary judgment is denied on the claim of failure to accommodate (Count I).

## C.   Claims Against Kachadurian (Counts IV and V)

Defendants argue that Plaintiff's claim that Kachadurian discriminated and retaliated against her under the PWDCRA when terminating her must be dismissed because he was not her employer under that statute.  Defendants argue that Kachadurian did not personally employ anyone, and he was not AIN's agent for purposes of making the outsourcing decision. *See* M.C.L. 37.1201(b); *Elezovic v. Bennett (on remand)*, 274 Mich.App. 1, 12, 15 (2007) (agents are "persons to whom the employing agency delegates supervisory power and authority over subordinates" on things such as "promotions, bonuses, overtime options, raises, shift and job assignments, and terminations").  Plaintiff failed to respond to Defendants' arguments

on this claim.

In reviewing the portions of the record cited by the parties, the Court has found no evidence that Kachadurian was involved in AIN's decision to outsource its EEG services at the Novi office (or any other office) to Synapse. The evidence reveals only that AIN's managing partners (Silverman and Elkiss) decided to enter into the Agreement to outsource AIN's EEG testing to Synapse, including at AIN's Novi office. In the absence of evidence that Kachadurian was an employer or agent for purposes of AIN's outsourcing decision, Plaintiff's claim that Kachadurian discriminated or retaliated against her under the PWDCRA when she was terminated should be dismissed.

## V.      CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 19] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Counts II, III, IV and V are DISMISSED and Count I REMAINS.

IT IS FURTHER ORDERED that Defendant Mark A. Kachadurian is DISMISSED.

IT IS ORDERED.

                                                    s/Denise Page Hood

Dated: May 29, 2020

DENISE PAGE HOOD
UNITED STATES DISTRICT JUDGE